UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-CV-23086-RAR

**BRENDA WRIGHT**, *et al.*,

    Appellants,

v.

**BIRD GLOBAL, INC.**, *et al.*,

    Appellees.
_____/

## ORDER GRANTING APPELLEES' JOINT MOTION TO DISMISS APPEAL

**THIS CAUSE** comes before the Court on Appellees'[1] Joint Motion to Dismiss Appeal ("Motion"). Appellants wish to modify certain elements of Bird Global, Inc. and affiliated debtor entities' Chapter 11 Plan of Liquidation ("Plan"), which a bankruptcy court approved in a Confirmation Order.[2] Appellees seek to dismiss this appeal on the grounds that it is both equitably and statutorily moot.[3] For the reasons explained below, this appeal is **DISMISSED AS MOOT**.

---

[1] The Court dismissed the Abbo Appellants' Consolidated Appeal on January 7, 2025. *See* [ECF No. 69]. The Abbo Appellants are accordingly not subject to the terms of this Order.

[2] *See generally* Amended Order (I) Approving the First Amended Disclosure Statement for Debtors' Second Amended Joint Chapter 11 Plan of Liquidation on a Final Basis, (II) Confirming the Debtors' Second Amended Joint Chapter 11 Plan of Liquidation, (III) Approving the Insurance Settlement Agreements, and (IV) Entering Bar Order and Channeling Injunction ("Confirmation Order"), [ECF No. 65-2] at 1–73.

[3] The matter has been fully briefed and is ripe for review. *See* [ECF No. 65] ("Motion"); [ECF No. 74] ("Response in Opposition"); [ECF No. 79] ("Reply"). The parties have also filed Supplemental Declarations and Authorities. *See* [ECF Nos. 82–84].

## BACKGROUND

Bird Global, Inc. distributed scooters for short-term rentals in many municipalities. Mot. at ¶ 12. Because of financial difficulties, *id.*, Bird Global and its related entities[4] ("Debtors") filed for Chapter 11 bankruptcy on December 20, 2023. *See In re Bird Glob., Inc.*, No. 23-20514, ECF No. 1 (S.D. Fla. Bankr. Dec. 20, 2023). The Chapter 11 proceedings were meant to enable the Debtors to sell substantially all of their assets to a Purchaser ("Purchaser") pursuant to section 363 of the Bankruptcy Code. Mot. at ¶ 12.

The Chapter 11 proceedings were also designed to provide payouts for tort claims ("Tort Claims") arising from the use of Debtors' scooters. *Id.* at ¶ 3. These Tort Claims were made against Debtors, municipalities where the scooters operated, and certain third parties. *Id.* The Debtors owned various insurance policies ("Policies") that included certain municipalities ("Municipalities") as additional insured and also indemnified those Municipalities, including cities like San Diego, from additional tort claims. *Id.*

On March 8, 2024, the Bankruptcy Court entered an Order (I) Authorizing and Approving (A) The Sale of Substantially All of the Debtors; Assets Free and Clear of All Liens, Claims, and Encumbrances and (B) The Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (II) Granting Related Relief ("Sale Order"). *See* Mot. at ¶ 13; [ECF No. 65-2] at 89–149; *In re Bird Glob., Inc.*, No. 23-20514, ECF No. 464 (S.D. Bankr. Mar. 8, 2024). The Sale Order approved both the sale of the Debtors' assets to the Purchaser as well as the assumption and assignment of certain municipal permits and Policies from the Debtors to the Purchaser.

---

[4] The related entities, including Bird Global, Inc., are Bird Rides, Inc., Bird US Holdco, LLC, Bird US Opco, LLC, and Skinny Labs, Inc. *See* Mot. at ¶ 2 n.1.

When the Debtors initiated Chapter 11 proceedings, their assets (including the Policies) became the property of their respective bankruptcy estates. Disputes arose over the Polices' scope and meaning. For one, Debtors and the insurance companies that issued the Policies ("Insurers") disagreed over their respective obligations under the Policies. Mot. at ¶ 16. For another, Municipalities, the Debtors, and the Purchaser disagreed over the effect of the Sale Order. While the Sale Order transferred certain municipal permits to the Purchaser, the parties were unclear on the extent of the Municipalities' right to indemnification under those permits. *Id.*

The Debtors, Insurers, Purchaser, and Municipalities ("Insurance Settlement Released Parties") soon agreed over the effect of the Sale Order and the status of the Policies in a set of settlement agreements ("Insurance Settlement Agreements"). *See* [ECF No. 65-2] at 179–304. The Insurance Settlement Agreements provided that the Policies would be sold to the respective Insurers free and clear of all claims in exchange for payments sufficient to pay the Tort Claims. Mot. at ¶ 18. In total, the Insurance Settlement Released Parties promised to contribute $19,216,036.50 to resolve the Debtors' claims. *Id.* at ¶ 17. The Debtors thereby cleaned up the proceedings in two ways. Entering Chapter 11 proceedings enabled the Debtors' assets, including the Policies, to be substantially sold to the Purchaser as approved through a Sale Order. And finalizing the Insurance Settlement Agreements resolved the status of the Insurance Settlement Released Parties' obligations under the Policies.

With these elements out of the way, the Debtors proposed a Chapter 11 Plan to liquidate their assets. The Plan involved several parts. The Plan transferred substantial funds to a Tort Claims Trust that would be used solely to pay the Tort Claims. [ECF No. 65] at Ex. A ("Rankin Declaration") ¶¶ 16–17. The Plan also transferred all remaining assets of the Debtors to a second Liquidating Trust. *Id.* at ¶ 10(a). To manage the remainder of the Debtors' estates, the Plan

coordinated with the Liquidating Trust and Tort Claims Trust's trustees. *Id.* at ¶ 15. And to deal with certain priority claims, the Plan irrevocably transferred assets to Equip Corporate Restructuring, LLC ("Equip"), the Debtors' claims agent. *Id.* at ¶ 10(d). Beyond these structural changes, the Plan coordinated the Insurance Settlement Agreements with the Plan's terms. Specifically, the Plan provided that a "Channeling Injunction" would transfer $19,216,036.50 from the Insurance Settlement Released Parties to Insurers. Mot. at ¶ 18. The Channeling Injunction precludes tort claimants from pursuing their Tort Claims against the Insurance Settlement Released Parties, and instead "channels" those specific claims into the Tort Claims Trust. *Id.* at ¶ 19.

Parties contested the Plan's confirmation. Certain Appellants filed Objections to the Plan, challenging—among other things—the Plan's structure, the nature of the Channeling Injunction, and the Bankruptcy Court's constitutional and statutory authority to enter a final order in Chapter 11 cases. *Id.* at ¶ 21. After a two-day hearing, and following additional briefing, the Bankruptcy Court determined that the Plan should be confirmed and that the Insurance Settlement Agreements should be approved. Confirmation Order at 41 ¶ 2. The Confirmation Order contained several findings relevant here. First, the Bankruptcy Court concluded that "the $19.2 million to be contributed to the tort claims trust will sufficiently fund the trust to resolve all asserted tort claims." *Id.* at 33–34 ¶ YY. In addition, the Bankruptcy Court found that the Insurers were "good faith" purchasers of the Policies under section 363(m) of the Bankruptcy Code. *Id.* at 38 ¶ ZZ.

After the Bankruptcy Court approved the Plan, Appellants sought to stay the Confirmation Order in both the Bankruptcy Court, *see* Order Denying Emergency Mot. to Stay Confirmation Order Pending Appeal, *In re Bird Glob., Inc.*, No. 23-20514, ECF No. 1254 (S.D. Fla. Bankr. Aug. 12, 2024), and this Court, *see generally* [ECF No. 35]. Neither court granted Appellants that relief. Appellants also filed an emergency motion for stay in the U.S. Court of Appeals for the Eleventh

Circuit, but they were unsuccessful and soon voluntarily dismissed that appeal. *See Wright v. Bird Glob., Inc.*, No. 24-12759, ECF No. 24 (11th Cir. Sept. 23, 2024); *id.*, ECF No. 33 (11th Cir. Oct. 4, 2024).

Meanwhile, the Plan became effective on September 16, 2024. *See* Notice of Occurrence of Effective Date of the Debtors' Second Amended Joint Chapter 11 Plan or Reorganization, [ECF No. 65-2] at 472–73; *see also In re Bird Glob., Inc.*, No. 23-20514, ECF No. 1397 (S.D. Fla. Bankr. Oct. 2, 2024) (denying Appellants' Expedited Motion to Strike Notice of Effective Date). Since that date, relevant parties have made distributions pursuant to the Plan. The Debtors, for example, have transferred $1,129.336.82 to Epiq, a claims handler, to satisfy priority claims, have paid $131,408.29 in statutory fees, and have distributed all assets designated by the Plan to the Liquidating Trust. Rankin Decl. at ¶ 10(d). The Purchaser has also followed the Confirmation Order to pay out priority claims to third party creditors and resolve lingering administrative costs. Mot. at ¶¶ 6, 32.

The parties have also fully funded the Tort Claims Trust. The Debtors have remitted $16,294,628.21 to the Tort Claims Trust, and at the time of the Motion's filing, the Tort Claims Trust had received $17,256,037.50, or 89.80%, of the Insurance Settlement Proceeds contemplated by the Plan and Insurance Settlement Agreements. [ECF No. 82] ("Fishman Declaration"), at 8–9. Since the Motion's filing, the Tort Claims Trust has been fully funded by the remaining Municipalities as well as by Insurance Settlement Proceeds. *Id.* at 10.

## STANDARD OF REVIEW

District courts may review bankruptcy decisions on appeal. *Miner v. Bay Bank & Trust Co.*, 185 B.R. 362, 365 (N.D. Fla. 1995), *aff'd*, 83 F.3d 436 (11th Cir. 1996). A bankruptcy court's factual findings are reviewed for clear error, and its legal conclusions are reviewed *de novo*. *See*

*Martin v. Martin*, 618 B.R. 326, 329 (S.D. Fla. 2020) (quoting *In re Englander*, 95 F.3d 1028, 1030 (11th Cir. 1996) (citation and internal quotations omitted)).  A bankruptcy court's factual findings may be clearly erroneous when "the reviewing court upon examining the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *Kane v. Steward Tilghman Fox & Bianchi, P.A.*, 485 B.R. 460, 468 (S.D. Fla. 2013) (cleaned up).  And when reviewing a bankruptcy court's legal conclusions *de novo*, the Court is required to make a judgment "independent of the bankruptcy court's, without deference to that court's analysis and conclusions."  *In re Piper Aircraft Corp.*, 244 F. 3d 1289, 1295 (11th Cir. 2001).  To that end, a district court may affirm a bankruptcy court's order "on any ground supported by the record."  *Martin*, 618 B.R. at 330 (quoting *In re Gosman*, 382 B.R. 826, 839 n.3 (S.D. Fla. 2007) (cleaned up)).

## **ANALYSIS**

This appeal concerns whether the Court can modify elements of a substantially consummated Plan.  While Appellants present numerous ways for the Court to modify the Plan, Appellees argue that such modifications would disrupt a substantially consummated plan in violation of established Eleventh Circuit precedent and parts of the Bankruptcy Code.

The Court cannot modify the Plan because the appeal is moot.  This appeal is *equitably* moot, because a review of the facts and Eleventh Circuit precedent clearly indicate that the Plan "has progressed to the point where effective judicial relief is no longer a viable option."  *In re Club Assocs.*, 956 F.2d 1065, 1069 n.11 (11th Cir. 1992).  And this appeal is *statutorily* moot, because Appellants seek a modification of integral elements of a bankruptcy-court-approved Plan that permits the sale of certain Policies to an undisputed, good-faith purchaser.  *See In re Stanford*, 17 F.4th 116, 122 (11th Cir. 2021).

### A. The Appeal is Equitably Moot

Appellants present several ways to modify the Plan "without affecting the rights of any entity not party to this appeal." Resp. in Opp'n at ¶ 4. The Court, Appellants suggest, could "vacate the Channeling Injunction and Bar Order solely as to claims against the Municipalities, order the Tort Claims Trustee to return the Municipalities' contribution, allow those claimants who hold claims against only the Municipalities to proceed, and channel the Municipalities' indemnification claims against the Tort Claims Trust." *Id.* Alternatively, Appellants urge the Court to "leave the entire scheme in place and modify the Channeling Injunction and Bar Order such that if the Appellants do not receive full payment on their claims, then Appellants will have relief from the Bar Order to pursue their claims against [a Municipality] to receive dollar-for-dollar credit for any recovery from the Tort Claims Trust." *Id.*

Appellees retort that any court-ordered modification of the Plan is unnecessary because Appellants' proposed modification would upset the Plan's core—namely, the Channeling Injunction and agreements made between the parties to coordinate Tort Claim payouts. *See* Mot. at ¶ 5. Because the Plan's terms have been consummated, the Appellees reason that the Appeal has now been rendered *equitably moot*—in other words, that the Plan is "so far gone" that the court "cannot grant effective judicial relief." Mot. at ¶ 8 (citing *Club Assocs.*, 956 F.2d at 1069). Appellees note that a host of other reasons, including the Eleventh Circuit's considerations as established in *Club Associates*, should lead the Court to conclude that the Plan is equitably moot. Mot. at ¶ 41; *see also BDO Seidman, LLP v. Freeman*, No. 05-23076, 2007 WL 9701126, at *5 (S.D. Fla. May 8, 2007) (noting that "[a] court must still consider all of the circumstances of the appeal to decide 'the ultimate issue of whether a confirmation plan has progressed to the point where *effective* judicial relief is no longer a viable

option.'" (quoting *Club Assocs.*, 956 F.2d at 1069 n.11 (emphasis added))). In evaluating each of the *Club Associates* factors, Appellees reason that the court should be wary of "unscrambl[ing]" a bankruptcy court's judgment when "the party aggrieved by a judgment has allowed the egg of that judgment to be scrambled." Mot. at ¶ 65 (quoting *Bennett v. Jefferson Cnty., Ala.*, 899 F.3d 1240, 1252 (11th Cir. 2018)).

Mootness arises in "a variety of flavors." *Stanford*, 17 F.4th at 121 (quoting *In re PW, LLC*, 391 B.R. 25, 33 (9th Cir. BAP 2008)). While constitutional mootness arises from the strictures of Article III, equitable mootness rests on more prudential considerations. An appeal can be moot under the doctrine because of "the effects of a reversal on third parties who have relied on a bankruptcy court's order" or "the complexity and difficulty of unwinding a contested transaction." *Id.* (citation omitted). The equitable mootness doctrine reflects a judicial "unwillingness to alter the outcome" of a reorganization plan where "granting the relief sought by the appellant would require upsetting the reorganization plan, which would be imprudent given the multitude of settlements and transactions that already occurred pursuant to the plan." *BDO Seidman*, 2007 WL 9701126, at *4. In evaluating an appeal for equitable mootness, a court has to "strik[e] the proper balance between the equitable concerns of finality and good faith reliance on a judgment and the competing interests that underlie the right of a party to seek review of a bankruptcy court order adversely affecting him." *Club Assocs.*, 956 F.2d at 1069; *see also Miami Ctr. Ltd. P'ship v. Bank of N.Y.*, 838 F.2d 1547, 1555 (11th Cir. 1988) (explaining that the equitable mootness doctrine avoids appellate decisions that would "knock the props out from under the authorization for every transaction that has taken place [and] create an unmanageable, uncontrollable situation for the Bankruptcy Court" (quoting *In re Roberts Farms, Inc.*, 652 F.2d 793, 797 (9th Cir. 1981))).

A court must consider "all the circumstances of an appeal" in striking that balance. *BDO Seidman*, 2007 WL 9701126, at *5. To guide a district court's equitable mootness inquiry, the Eleventh Circuit has set forth four factors: (i) whether a stay pending appeal has been obtained; (ii) whether the reorganization plan has been substantially consummated; (iii) the effect of the relief the appellant seeks on the interests of third parties not before the court; and (iv) whether relief would "affect the re-emergence of the debtor as a revitalized entity." *In re Nica Holdings*, 810 F.3d 781, 786 (11th Cir. 2015) (quoting *Club Assocs.*, 956 F.2d at 1069 n.11).

Two *Club Associates* factors are undisputed and lend support to Appellees' position. This Court has already concluded that Appellants fail to meet any of the factors required for a stay, running against the "important policy of bankruptcy law that court-approved reorganization plans be able to go forward based on court approval unless a stay is obtained." *Miami Ctr.*, 838 F.2d at 1555; *see* [ECF No. 35] at 2, 8; *see also* Resp. in Opp'n at ¶ 25 (conceding that Appellants have not obtained a stay).

The parties also agree that the Plan has been substantially consummated. *Compare id.* at ¶¶ 4, 25, 43, *with* Reply at ¶ 1. Under the Bankruptcy Code, a plan is "substantially consummated" if: (i) "substantially all of the property proposed by the plan" has been transferred, 11 U.S.C. § 1101(2)(A); (ii) the debtor or successor to the debtor has managed or assumed "all or substantially all of the property dealt with by the plan," § 1101(2)(B); and (iii) distributions have commenced pursuant to the plan, § 1101(2)(C).

The facts surrounding the Plan easily map onto this statutory definition. The Debtors have transferred funds to Epiq for payment of priority claims, distributed required assets to the Liquidating Trust, and paid all necessary fees to the United States Trustee. Mot. at ¶ 47. Insurance Settlement Proceeds and a Municipalities Trust Contribution have fully funded the Tort Claims

Trust pursuant to a settlement between the Debtors and those Municipalities. Fishman Decl. at 9–10. Various parties have also acted in reliance on the Plan. To administer their respective trusts, the Liquidating Trustee and Tort Claims Trustee have incurred administrative fees, expenses, and costs. Mot. at ¶ 47. And pursuant to the Plan, the Purchaser has paid priority tax and wage claims, paid professional fees to resolve claims, and funded a portion of the Tort Claims Trust. *Id.* The parties' actions since the Confirmation Order, in short, make it difficult to unwind the Plan wholesale. *BDO Seidman*, 2007 WL 9701126, at *5.

While "substantial consummation by itself does not resolve the issue," a full review of the facts only lends further support for Appellees' argument. Appellants argue that a wholesale unwinding of the Plan is unnecessary, as the Court *could* grant relief "by providing that Appellants[ ] may pursue their claims against the City of San Diego." Resp. in Opp'n at ¶ 21. As examples, Appellants suggest that the Court could "return [ ] the Municipalities Trust Contribution," or that the Appellants could obtain "relief from the Channeling Injunction and Bar Order to the extent that Appellants do not receive full satisfaction from the Tort Claims Trust." *Id.* In Appellants' view, the Court could "strike or modify offending provisions" of the Plan *sua sponte*, *see id.* at ¶ 27 (citing *In re One2One Commc'ns, LLC*, 805 F.3d 428, 434 (3d Cir. 2015)), or remand this matter to the Bankruptcy Court "to fashion an equitable remedy." *Id.* (citing *In re Am.-CV Station Grp., Inc.*, 56 F.4th 1302, 1313 (11th Cir. 2023), *remanded*, 657 B.R. 904 (Bankr. S.D. Fla. 2024)).

Appellants' arguments overlook the Plan's complexities. Appellants are *broadly* correct that the fundamental benefit of the bargain as expressed in the Plan was the "full satisfaction of Appellants' claims." *Id.* at ¶ 21. Yet Appellants fail to recognize that the Bar Order and Channeling Injunction they contest are critical in *ensuring* the full and expeditious satisfaction of

their claims. The Order and Injunction channel Tort Claims against the Debtors into a single Tort Claims Trust in order to avoid protracted, piecemeal litigation over specific Tort Claims. Confirmation Order at 30 ¶ YY. As the Bankruptcy Court stated in its Order, the costs of litigating each Tort Claim and the Debtors' ability to satisfy the applicable self-insured retention obligation for each Tort Claim would likely decrease the total payout for each Appellant when compared to the proposed distributions under the Plan and Insurance Settlement Agreements. *Id.* at 30–31 ¶ YY. The very design of the Bar Order and Channeling Injunction, then, avoids delays in disbursing money owed to the Tort Claimants and Appellants, while still "materially reduc[ing] recoveries due to litigation costs." *Id.* at 30 ¶ YY.

Removing or modifying elements of the Plan would thus adversely affect the expectations of the Plan's participants and third parties not before the Court. As the Bankruptcy Court noted, relevant parties agreed to the Insurance Settlement Agreements *because of* the terms of the Channeling Injunction and Bar Order, which precluded Municipalities from asserting claims against the Debtors and making claims against the Policies. *Id.* at 30 ¶ YY. The Purchaser—one of the parties to the Insurance Settlement Agreements—entered into the Agreements with the expectation that it would not be sued for liabilities stemming from the Tort Claims after the Agreements' approval. Since the Plan's approval and pursuant to that expectation, the Purchaser has engaged in numerous actions with third parties. The Purchaser has both agreed to pay priority tax and Chapter 11 administrative claims, *see* Mot. Ex. A ("Prodan Declaration") at ¶ 6, and has transferred funds from the Debtors and Epiq to holders of allowed priority wage claims. *Id.* at ¶ 8.

Disrupting elements of the Plan and the relief that the Bankruptcy Court has ordered would not only prejudicially reverse elements of the Plan that have been paid out to third parties, but

would also affect the ability of tort claimants who are *not* Appellants to receive a payout for their Tort Claims—many of whom have waited years for payment. *See* Reply at ¶ 17.  The sole purpose of the Channeling Injunction and Bar Order was to provide a method for all Tort Claimants to receive payouts through a single Tort Claims Trust.  Unwinding the Bankruptcy Court's Confirmation Order to enable a subset of Appellants to sue a certain Municipality (San Diego) that has already contributed sums to that Trust would reduce the total sum of money available in the Trust for *all* claimants.  *See* Resp. in Opp'n at ¶¶ 4, 42.  Given that the Bankruptcy Court has already agreed that the terms of the Plan were fair, and given that the Tort Claims Trust has now been fully funded, *see* Fishman Decl., it makes little sense to restructure elements of a substantially consummated Plan to benefit certain Appellants at the expense of third parties—including other Tort Claimants—who have reasonably relied on the Plan and the Bankruptcy Court's Confirmation Order in subsequent dealings.

The fourth and final *Club Associates* factor—whether the requested relief would affect the reemergence of the debtor as a revitalized entity—supports Appellees' position, considering that the Debtors are no longer a viable entity *because of* the Plan's substantial consummation.  Recall that the basis for the Plan was for the Debtors to sell assets to the Purchaser to provide funds for payment of Tort Claims to Tort Claimants given the Debtors' financial difficulties. Mot. at ¶ 12. Prior to the Plan's execution, the Debtors had already sold most of their assets to the Purchaser and had sold Policies to certain Insurers pursuant to Insurance Settlement Agreements.  *Id.* at ¶¶ 12, 17–18.  And after the Plan's approval, the Debtors began the process of liquidating their remaining assets by distributing them to a Liquidating Trust, distributing proceeds from the Policies' sale to the Tort Claims Trust, and making all required administrative payments.  Rankin Decl. at ¶ 10; Mot. at ¶ 47.  Requiring some parts of the Plan to be trimmed when the Debtors—

essential parties to that Plan—have ceased to exist as an entity is impracticable, as it is now "legally and practically impossible to unwind the consummation of the plan or otherwise to restore the status quo before confirmation." *Miami Ctr.*, 838 F.2d at 1557.

The relief Appellants seek simply cannot be granted given the circumstances of this case. The Court's meddling in an otherwise substantially consummated Plan would disrupt settled expectations and frustrate the intentions of numerous parties who created the Plan to efficiently resolve latent Tort Claims.  The inability of this Court to change the Plan without creating an "unmanageable, uncontrolled situation for the bankruptcy court" leads the Court to conclude that Appellants' appeal must be dismissed as equitably moot.  *In re Fisherman's Pier, Inc.*, 460 F. Supp. 3d 1345, 1353 (S.D. Fla. 2020) (quoting *In re Bayou Shores SNF, LLC*, 828 F.3d 1297, 1328 (11th Cir. 2016)).

## B.  The Appeal is Statutorily Moot

Appellees also contend that the Court may dismiss this appeal as statutorily moot, for allowing the appeal to proceed "would adversely disrupt a consummated sale in violation of § 363(m) of the Bankruptcy Code."  Mot. at ¶ 39 (first citing 11 U.S.C. § 363(m); and then citing *In re The Charter Co.*, 829 F.2d 1054, 1056 (11th Cir. 1987)); *see* Reply at ¶ 30.  Appellants respond that section 363(m) would not bar this appeal, because "the appeal challenges something other than the validity of the underlying transaction."  Resp. in Opp'n at ¶ 38.  In Appellants' telling, statutory mootness cannot apply because their proposed relief "does not implicate the validity of the sale," and they challenge "the general validity of channeling injunctions and bar orders in favor of non-purchasers where the channeled claims do not relate to the asset being sold." *Id.* at ¶ 44.

Upon review, it is wholly clear that this appeal can be dismissed because it is also statutorily moot. Section 363(m) of the Bankruptcy Code states that

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). The language of the statute "states a flat rule governing all appeals of section 363 authorizations." *Stanford*, 17 F.4th at 122 (quoting *The Charter Co.*, 829 F.2d at 1056). That rule is relatively simple: "[O]nce a sale is approved by the bankruptcy court and consummated by the parties, the bankruptcy court's authorization of the sale cannot be effectively altered on appeal." *Id.* (quoting *The Charter Co.*, 829 F.2d at 1056).

Under the plain meaning of section 363, then, a reviewing court will not disturb a bankruptcy court's review of a sale of a bankruptcy estate's property if three elements are satisfied. *Id.* First, the bankruptcy court must have authorized bankruptcy trustees and debtors-in-possession to use, sell, or lease certain property in the bankruptcy estate. *See* 11 U.S.C. § 363(m) (citing §§ 363(b)–(c)); *see also Stanford*, 17 F.4th at 122–23 (noting that section 363(m) makes clear that "*all* 'authorizations' are covered, not just those that may be *proper* under the Code" (emphasis in original)). Second, the sale of that property must be "transacted with an 'entity that purchased or leased [the] property in good faith.'" *Id.* at 123 (quoting 11 U.S.C. § 363(m)). Finally, the appellant must have failed to obtain a stay of the bankruptcy court's order. *Id.*

Each element of statutory mootness has been easily satisfied. No party disputes that the Bankruptcy Court's Confirmation Order authorized the sale of the Policies pursuant to the Insurance Settlement Agreements. *See generally* Confirmation Order. No party, in turn, disputes the Bankruptcy Court's conclusion that the sale of those Policies was done "in good faith."

Confirmation Order at 38 ¶ ZZ.  And Appellants concede that they have not obtained a stay of the Confirmation Order.  Resp. in Opp'n at ¶ 25.

Appellants respond by suggesting that Eleventh Circuit caselaw establishes an atextual, "general impropriety exception" to section 363.  *Id.* at ¶ 48.  Under this supposed exception, Appellants contend that courts have held that section 363(m) "does not bar appeals from sale orders where the appeal asserts a categorical objection against the general type of transaction rather than a challenge to the specifics of the approved sale."  *Id.* (citing *Stanford*, 17 F.4th at 123).  Because Appellants construe their appeal as challenging "the general validity of channeling injunctions and bar orders in favor of non-purchasers where the channeled claims do not relate to the asset being sold," *id.* at ¶ 44, Appellants suggest that the terms of the Channeling Injunction and Bar Order can be modified.

Appellants' argument suffers from three flaws.  Fundamentally, their reading of section 363 flatly contradicts its plain meaning.  A "general impropriety exception" exists nowhere in the statute, and the Court is unaware of any judicial opinion that suggests that a reviewing court may overturn parts of a bankruptcy court's order under section 363(m) because it could disagree with some aspects of it.  *See Stanford*, 17 F.4th at 122 ("By precluding the possibility of relief, Section 363(m) statutorily 'moots' appeals from authorizations under Section 363(b) or (c), unless they are stayed.").  While Appellants cite *In re Stanford* to support their argument, that case instead stands for the more general proposition that section 363(m) bars courts from "undo[ing] a completed sale to a good-faith purchaser."  17 F.4th at 119.  Appellants' other case in support of the "general impropriety exception" concerns an entirely different provision of the Bankruptcy Code, and the Court declines to read in elements of one statute to alter the plain meaning of another in the absence of a circuit court opinion that squarely adopts any such exception.  *See* Resp. in

Opp'n at ¶¶ 38–39 (citing *In re Saybrook Mfg. Co., Inc.*, 963 F.2d 1490, 1491 (11th Cir. 1992)); *id.* at ¶ 38 n.5 (conceding that *Saybrook Manufacturing* concerns appeals brought under section 364(e) of the Bankruptcy Code)).

Appellants' challenge to the Confirmation Order would clearly impact the validity of the sale by removing the bargained-for consideration the Insurers provided in exchange for consummating their Insurance Settlement Agreements. As the Bankruptcy Court noted, the sale of the Policies in connection with the Insurance Settlement Agreements was "an integral part of the Debtors' Plan," Confirmation Order at 28 ¶ YY, because "none of the Insurance Settlement Released Parties would have entered into the Insurance Settlement Agreements absent entry of the Channeling Injunction and the Bar Order," *id.* at 29 ¶ ZZ. The legal mechanism of a Channeling Injunction and Bar Order were necessary components of the Plan, because Insurers would not have agreed to provide payments to a Tort Claims Fund if they knew that they could be sued *despite* the Injunction and Bar Order's entry. Appellants' exhortations to the Court to enable them to sue certain Insurance Settlement Released Parties that have wholly satisfied their contributions to the Tort Claims Fund would frustrate the Plan's purpose by calling into question the very components that allowed the Insurers and Insurance Settlement Released Parties to come to an agreement. *See* Mot. at ¶ 60 (noting that the Insurance Settlement Agreements were predicated on obtaining a final Confirmation Order).

Appellants' arguments essentially rehash points that this Court and the Bankruptcy Court have rejected in prior orders. Appellants generally contest the propriety of channeling injunctions and bar orders that affect "non purchasers," but those arguments appear to contest the validity of general third-party nondebtor releases, which the Bankruptcy Court already has reviewed and rejected. Confirmation Order ¶ YY. In affirming the Bankruptcy Court's application of

*Harrington v. Purdue Pharma L.P.*, this Court noted that the Supreme Court's decision is inapplicable given that the Confirmation Order approves a Plan that "provide[s] for the full satisfaction of claims against a third-party nondebtor." *Id.* at 3 (citing 603 U.S. 204, 226–27 (2024)); *see Purdue*, 603 U.S. at 226 ("[W]e do not address whether our reading of the bankruptcy code would justify unwinding reorganization plans that have already become effective and been substantially consummated."); *see also* Confirmation Order 33–34 ¶ YY ("[T]he [Bankruptcy] Court is satisfied that the historical claim information indicates that the $19.2 million to be contributed sufficiently funds the Tort Claims Trust to resolve and provide for payment *in full* of all asserted Tort Claims."). The Court declines to unwind the parties' approved Plan based on a theory concerning third party nondebtors that has been litigated and squarely rejected twice over.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** as follows:

1. Appellees' Joint Motion to Dismiss Appellants' Appeal, [ECF No. 65], is **GRANTED**.
2. This appeal, [ECF No. 1], is **DISMISSED**.
3. The Clerk is directed to **CLOSE** this case.
4. Any pending motions are **DENIED AS MOOT**.

**DONE AND ORDERED** in Miami, Florida, this 11th day of June, 2025.

_____
**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**